UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| KEVIN GLOVER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:14-cv-344 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Kevin Glover, on September 22, 2014. For the following reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Kevin Glover, filed an application for Disability Insurance Benefits and Supplemental Security Income on March 24, 2011, alleging a disability onset date of January 22, 2011. (Tr. 21). The Disability Determination Bureau denied Glover's claims on July 7, 2011, and again upon reconsideration on October 7, 2011. (Tr. 21). Glover subsequently filed a timely request for a hearing on November 9, 2011. (Tr. 21). A hearing was held on January 22, 2013, before Administrative Law Judge (ALJ) Edward P. Studzinski, and the ALJ issued an unfavorable decision on February 14, 2013. (Tr. 21–29). Vocational Expert (VE) Leonard M. Fisher and Glover testified at the hearing. (Tr. 21). The Appeals Council granted review and issued an unfavorable decision, making the Appeals Council's decision the final decision of the Commissioner. (Tr. 1–8).

The ALJ found that Glover met the insured status requirements of the Social Security Act through September 30, 2013. (Tr. 23). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Glover had not engaged in substantial gainful activity since January 22, 2011, the alleged onset date. (Tr. 23). At step two, the ALJ determined that Glover had the following severe impairments: history of remote stroke, pancreatic cysts, and syncope. (Tr. 23). At step three, the ALJ concluded that Glover did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 24). In determining whether Glover had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ considered Listing 11.02, convulsive epilepsy, Listing 11.03, nonconvulsive epilepsy, and Listing 11.04, central nervous system accident. (Tr. 24).

The ALJ then assessed Glover's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) as the claimant is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently and sit, stand and/or walk for six hours in an eight hour workday, except: the claimant is unable to balance, must avoid all exposure to hazards such as unprotected heights and open flames and driving and must avoid concentrated exposure to unguarded hazardous machinery at jobs that do not involve repetitive or constant forceful grasping or torqueing.

(Tr. 24). The ALJ explained that in considering Glover's symptoms he followed a two-step process. (Tr. 24). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Glover's pain or other symptoms. (Tr. 24). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Glover's functioning. (Tr. 25).

2

Glover alleged a disability due to a history of stroke and pancreatic cancer. (Tr. 25). He testified that he walked with a cane because of right leg weakness, that his hands shook, despite taking seizure medication, and that he had difficulty writing due to right hand arthritis. (Tr. 25). Glover stated that he spoke with a stutter and had difficulty expressing himself. (Tr. 25). The ALJ found that the record did not support a need for an ambulatory aid, and the VE testified that cane use would not preclude Glover's past work. (Tr. 25). The ALJ also found that Glover's impairments could cause his alleged symptoms but that his statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. 25).

In March 2011, Glover went to Methodist Hospital because of right-sided weakness and an acute onset of speech difficulty. (Tr. 25). He was diagnosed with a stroke and received tPA to break apart any clots. (Tr. 25). Three days later Glover was discharged in stable condition after regaining use of his leg and right arm and the resolution of his slurred speech. (Tr. 25). In April 2011, Glover reported to his treating physician, Rachel Ross, M.D., to follow up for his stroke. (Tr. 25). She found Glover's course stable and nonprogressive without associated symptoms. (Tr. 25). Additionally, her examination demonstrated that Glover had full range of motion in his joints, that his heart had a normal rate and rhythm, and that he was fully oriented during the examination with intact memory, concentration, and language. (Tr. 25).

In February 2011, Glover went to Dr. Ross for abdominal pain, and she recommended that he undergo a colonoscopy and a biopsy. (Tr. 25). A March 2011 MRI revealed a 2mm pancreatic cyst and two small liver cysts, but a CT scan did not show any cystic lesions. (Tr. 25). The ALJ noted that Glover did not seek additional treatment until October 2012 when he fell unconscious. (Tr. 25). Glover stated that he received medication from people on the street after regaining consciousness. (Tr. 26). A CT scan was normal except for mild low density of

the subcortical white matter bilaterally. (Tr. 26). A physical examination showed that Glover could walk with a normal gait, walk on his toes and heels, and tandem walk. (Tr. 26). He was discharged in stable condition five days later after his altered mental state subsided. (Tr. 26). The ALJ stated that Glover's gap in treatment did not support a claim of continuous disability. (Tr. 25). He indicated that Glover was eligible for treatment from the Veterans' Administration, but Glover claimed that he was unaware of those benefits. (Tr. 25–26). Considering Glover's education and work experience, the ALJ did not find this claim credible. (Tr. 25–26).

In October 2012, Glover began receiving treatment for syncope at Methodist Hospital. (Tr. 26). He had not taken medication for one year at that point. (Tr. 26). In November 2012, Glover reported that Dilantin was not working and that he could not hold a glass of water without spilling because his arms shook. (Tr. 26). His wife stated that he had two seizures that morning. (Tr. 26). In December 2012, Glover received a cane because he had an abnormal gait. (Tr. 26). The ALJ stated that he did not seek treatment after December 2012. (Tr. 26).

In June 2011, Dr. Olabode Oladeinde conducted a psychiatric consultative examination. (Tr. 26). Glover reported right arm weakness and that he tripped and fell frequently after his March 2010 stroke. (Tr. 26). Despite Glover's abnormal gait, the ALJ stated that there was no evidence of a neurologic deficit to account for that abnormality. (Tr. 26). Dr. Oladeinde concluded that Glover was staging his symptoms because he resisted movement at his right hand joint and appeared to lean to his right side when walking. (Tr. 26). He also found Glover's range of motion examination fraudulent and unreliable. (Tr. 26). During the examination, Glover had full strength, reflexes, and spinal range of motion and was intact neurologically. (Tr. 26). The ALJ stated that Dr. Oladeinde's examination did not support Glover's credibility. (Tr. 26).

4

The ALJ found Glover incredible, considering his allegations and complaints. (Tr. 26). The ALJ noted that Glover had a gap in treatment, despite being eligible for treatment from the VA clinic, and that he was concentrating on getting his job back, which suggested an ability to work and to pursue his interests actively. (Tr. 26). The ALJ stated that he expected Glover to take advantage of the assistance available to him, considering his education and past skilled work. (Tr. 26). He also noted that Dr. Oladeinde found that Glover was staging his symptoms, which suggested that Glover was exaggerating the severity of his symptoms. (Tr. 26). Additionally, the ALJ stated that the record supported a history of alcohol and marijuana use, despite Glover testifying that he drank only socially and used marijuana remotely. (Tr. 26).

The ALJ rejected Glover's alleged onset date of January 22, 2011. (Tr. 26). He indicated that the record did not support Glover's testimony that Glover stopped working due to gastrointestinal problems. (Tr. 26). The ALJ also stated that Glover could not stack his impairments to satisfy the durational requirement for disability, despite suffering a stroke in March 2011. (Tr. 26–27). He indicated that Glover's CT scans were normal and that his follow-up visit demonstrated that Glover was fully oriented and that his extremities had full strength and range of motion. (Tr. 27). Despite having a small pancreatic cyst, an abdomen CT scan did not show evidence of cystic lesion, and Glover was not diagnosed with pancreatic cancer. (Tr. 27). The record did not demonstrate a history of syncope or hand tremors. (Tr. 27). The VE testified that Glover could not perform his past work if the ALJ limited him to occasional handling, fingering, and feeling of his right hand. (Tr. 27). The ALJ rejected the VE's finding because the record did not show any limitations with Glover's right hand. (Tr. 27).

The ALJ then reviewed the opinion evidence. (Tr. 27–28). Dr. William Shipley, a State agency psychological consultant, completed a Psychiatric Review Technique Form on July 6,

5

2011. (Tr. 27). He concluded that Glover had no medically determinable mental impairments. (Tr. 27). Dr. Joelle Larsen, a State agency psychological consultant, affirmed Dr. Shipley's assessment. (Tr. 27). The ALJ gave those opinions great weight because they were consistent with the record as a whole. (Tr. 27). Additionally, the ALJ noted that Glover did not allege a mental impairment except for receiving psychiatric medications during his brief treatment at the VA Hospital. (Tr. 27).

Dr. Shipley completed a second Psychiatric Review Technique Form and found that Glover's adjustment disorder was not severe. (Tr. 27). He concluded that the disorder caused mild restrictions in daily living activities, mild difficulty in social functioning, mild limitation in concentration, persistence, and pace, and no extended episodes of decompensation. (Tr. 27). The ALJ gave this opinion little weight. (Tr. 27). He noted that Glover did not seek much treatment for his depression and that it was related mostly to his financial and physical condition. (Tr. 27).

On July 7, 2011, Dr. J. Sands, a State agency medical consultant, completed a Physical Residual Functional Capacity Assessment. (Tr. 27). Dr. Sands found that Glover could perform work at the medium exertional level because he could lift or carry fifty pounds occasionally and twenty-five pounds frequently and sit, stand, or walk for six hours of an eight hour workday. (Tr. 27). Dr. B. Whitley, a State agency medical consultant, affirmed Dr. Sands assessment. (Tr. 27). The ALJ gave those opinions little weight because updated medical records indicated that Glover received a cane for right sided weakness that caused an abnormal gait and anti-seizure medication for shaking in his arms. (Tr. 28). Considering the updated medical records, the ALJ found that Glover could lift and carry twenty pounds occasionally and ten pounds frequently and could sit, stand, or walk for six hours in an eight hour workday. (Tr. 28). He also concluded that

6

Glover could not balance and must avoid concentrated exposure to unguarded, hazardous machinery at positions that did not involve repetitive or constant forceful grasping or torqueing. (Tr. 28).

The ALJ gave some weight to Nadia Dross's opinions. (Tr. 28). Dross, Glover's niece, completed a Third Party Function Report. (Tr. 28). Dross stated that Glover's right sided weakness caused difficulty cooking and cleaning. (Tr. 28). The ALJ stated that he gave Dross's opinions some weight but did not rely on her opinions. (Tr. 28). He also stated that he gave her opinions little weight to the extent that they conflicted with the record regarding Glover's ability to work. (Tr. 28).

At step four, the ALJ found that Glover could perform his past relevant work as a customer service representative. (Tr. 28). He stated that Glover's RFC did not preclude the performance of his work-related activities as a customer service representative. (Tr. 28).

On July 18, 2014, the Appeals Council found that Glover was not disabled. (Tr. 7). Before issuing its decision, the Appeals Council reviewed Glover's additional comments. (Tr. 4). Glover told the Appeals Council that his necessity for a cane for standing and walking precluded his past work as a customer service representative. (Tr. 4). Glover testified that he stood or walked for two hours out of an eight hour workday as a customer service representative and that he held his cane in his dominant hand. (Tr. 4). Therefore, he argued that his cane use would limit his handling, fingering, and reaching to his non-dominant hand for one quarter of the workday. (Tr. 4). Because a customer service representative required frequent handling, fingering, and reaching, Glover claimed that his cane use would preclude his past work. (Tr. 4).

The Appeals Council did not find that Glover's cane use would limit him to occasional use of his dominant hand for reaching, handling, and fingering. (Tr. 4). Rather, it concluded that

7

his cane use would allow for frequent use of his dominant hand. (Tr. 4–5). The Appeals Council also adopted much of the ALJ's opinion. (Tr. 5). It adopted his statements regarding the Social Security Act, Regulations, and Rulings, the issues of this case, and the evidentiary facts. (Tr. 5). It adopted the ALJ's unfavorable disability finding and his findings at steps one, two, and three. (Tr. 5). The Appeals Council found the same RFC as the ALJ, except it added a cane requirement for standing and walking. (Tr. 5). It adopted the ALJ's credibility finding and agreed that Glover could perform his past relevant work as a customer service representative. (Tr. 5). It noted the VE's testimony that's Glover cane use would not preclude his past work. (Tr. 5).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347

F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if

the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Glover has argued that the Appeals Council found incorrectly that he did not have a medically determinable mental impairment. At step two, the claimant has the burden to establish that he has a severe impairment. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). A severe impairment is an "impairment or combination of impairments which significantly limits [one's] physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 404.1521(a)**; *Castile*, 617 F.3d at 926. Basic work activities include "the abilities and aptitudes necessary to do most jobs." **20 C.F.R. § 404.1521(b);** *Stopka v. Astrue*, 2012 WL 266341, at *1 (N.D. Ill. Jan. 26, 2012). "[A]n impairment that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." Social Security Ruling 96-3p, 1996 WL 374181, at *1. Courts have characterized step two as a *de minimis* screening device that disposes of groundless claims. *Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990); *Elkins v. Astrue*, 2009 WL 1124963, at *8 (S.D. Ind. April 24, 2009) (citing **Webb v. Barnhart**, 433 F.3d 683, 688 (9th Cir. 2005)); *see Stopka*, 2012 WL 266341 at *1 (listing cases supporting same).

The Appeals Council adopted the ALJ's step two finding and found that Glover had three severe impairments: history of remote stroke, pancreatic cysts, and syncope. (Tr. 5). Glover has argued that the Appeals Council should have found that his adjustment disorder and anxiety disorder were medically determinable impairments. He has indicated that the ALJ rejected his adjustment disorder because Glover had sought very little treatment for it. He has claimed that the ALJ should have used that finding to assess the severity of his adjustment disorder rather than deciding whether it was medically determinable. Glover also has stated that the Appeals Council and the ALJ failed to discuss his anxiety disorder. He has argued that the Appeals Council's and the ALJ's failure to consider the effects of the above disorders on his ability to work was a reversible error. The Commissioner has argued that any error by the Appeals Council or the ALJ was harmless because the Appeals Council and the ALJ recognized other severe impairments and proceeded with the evaluation process. *See Castile*, 617 F.3d at 927. She indicated that the ALJ considered Glover's mental impairments and found them non-severe.

The Commissioner indicated correctly that any error at step two would be harmless if the Appeals Council or the ALJ found a severe impairment, proceeded through the evaluation process, and considered the total effect of Glover's impairments. *See Castile*, 617 F.3d at 927. However, the ALJ cannot ignore a line of evidence that suggests a disability. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("[T]he ALJ may not ignore an entire line of evidence that is contrary to the ruling . . . ."). Here, the Appeals Council and the ALJ found other severe impairments and proceeded through the evaluation process. The ALJ also considered and discussed Glover's adjustment disorder. (Tr. 27). He noted Dr. Shipley's July 6, 2011 opinion, which found that Glover's adjustment disorder was non-severe and that it caused mild limitations. (Tr. 27). The ALJ rejected that opinion because Glover sought minimal

11

treatment for his depression. (Tr. 27). Therefore, the ALJ did not ignore Glover's adjustment disorder.

The ALJ also did not ignore Glover's anxiety disorder. The ALJ indicated that Glover sought treatment at the VA Hospital and received psychiatric medication. (Tr. 27). Glover complained about anxiety at the VA Hospital. (Tr. 473–74). It is clear that the ALJ at least considered Glover's anxiety disorder because he referenced Glover's treatment at the VA Hospital. Therefore, any error at step two was harmless because the ALJ found a severe impairment, proceeded through the evaluation process, and at least considered the aggregate effect of Glover's impairments, including his adjustment and anxiety disorders. *See **Castile***, 617 F.3d at 927. However, the court will determine whether the ALJ discussed Glover's anxiety disorder adequately within Glover's RFC argument.

Next, Glover has argued that the Appeals Council failed to include a limitation based on his speech and mental impairments in the RFC. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Glover has claimed that the Appeals Council failed to include a limitation for his mental impairments in the RFC. As discussed above, the Appeals Council adopted the ALJ's findings and the ALJ rejected Glover's adjustment disorder. However, the ALJ did not discuss Glover's anxiety disorder adequately. Although the ALJ referenced Glover's treatment at the VA Hospital, neither the Appeals Council nor the ALJ discussed Glover's anxiety disorder or the corresponding medical records. The ALJ did not discuss Dr. Zhang, who diagnosed Glover with anxiety disorder and prescribed Remeron. (Tr. 500–01). He also did not mention Glover's four counseling sessions that indicated ongoing anxiety symptoms. (Tr. 473–74, 482–83, 488–94).

The VE testified that Glover could not perform his past work if his anxiety disorder, medication, and speech difficulties limited him to simple, routine, and repetitive work. (Tr. 92–93). Because Glover's anxiety disorder could have precluded his past work, that evidence

13

undermined the ALJ's ultimate conclusions, which required the ALJ to confront the evidence. *See Moore*, 743 F.3d at 1123. The Commissioner has argued that the ALJ relied on Dr. Shipley's opinion when considering Glover's mental impairments. However, Dr. Zhang diagnosed Glover with anxiety disorder more than one year after Dr. Shipley issued his opinion. (Tr. 500). The Commissioner also has claimed that the ALJ considered the evidence by noting briefly that Glover sought treatment at the VA Hospital. However, without any mention or discussion of Glover's anxiety disorder, this court cannot determine whether the ALJ's decision rests upon substantial evidence. The ALJ should discuss Glover's anxiety disorder on remand and explain how it affects his ability to perform his past skilled work.

Glover also has argued that the Appeals Council erred by failing to include a limitation for his speech impairment. He has noted that the Appeals Council found his history of stroke to be a severe impairment and that it included limitations in balancing and exposure to hazards based on his stroke. However, he has stated that the council failed to state why it did not include a limitation for the speech difficulties that arose from his stroke. He also has indicated that the ALJ found his speech "somewhat halting" at the hearing, which demonstrated that he had difficulty speaking nearly two years after his stroke. (Tr. 42).

The Appeals Council adopted the ALJ's findings at step three. The ALJ noted Glover's claims of a stutter and difficulty expressing himself after his stroke. (Tr. 25). He also discussed Glover's March 2011 Methodist Hospital treatment records, which indicated that Glover reported to the hospital for speech difficulty and right-sided weakness. (Tr. 25). The ALJ stated that Glover was diagnosed with a stroke and released three days later in stable condition after his symptoms, including his slurred speech, had resided. (Tr. 25). Additionally, the ALJ reviewed Glover's follow up treatment for his stroke and stated that the record demonstrated no associated

14

symptoms. (Tr. 25). Furthermore, the ALJ reviewed Glover's stroke medical records and found Glover incredible regarding the severity of his symptoms.

The ALJ discussed Glover's speech impairment adequately. He reviewed Glover's allegations of speech difficulty and his medical records concerning his speech. The ALJ indicated that Glover's slurred speech had resolved a few days after his stroke and that he did not have any associated symptoms one month after his stroke. Although the ALJ did not state specifically why Glover's alleged speech difficulty would not affect his ability to work, he did create a logical bridge from the evidence to his conclusion by noting that Glover's speech difficulties had resolved. However, the ALJ can explain explicitly why Glover's speech difficulties did not affect his ability to work on remand.

Glover also has argued that the Appeals Council failed to afford weight to his niece's opinions. Dross stated that Glover's right-sided weakness limited his ability to cook and clean. (Tr. 28). An ALJ may consider evidence from non-medical sources, including relatives. *See* **20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4)**; *see also* SSR 06-3p, 2006 WL 2329939, at \*2 (Aug. 9, 2006). Generally, the ALJ should explain the weight given to a non-medical source to allow a reviewer to follow his reasoning. SSR 06-3p, 2006 WL 2329939 at \*6.

Glover has claimed that the Appeals Council did not indicate what weight it afforded to Dross's opinions. He has indicated that the Appeals Council considered his subjective complaints and adopted the ALJ's findings regarding his subjective complaints, but has noted that Dross's opinions were separate from his subjective complaints. He has claimed that the Appeals Council did not consider Dross's opinions.

Even if the Appeals Council adopted the ALJ's findings regarding Dross's opinions, Glover has argued that the ALJ explained his conclusions inadequately. Glover has indicated

15

that the ALJ afforded some weight to Dross's opinions but gave little weight to the extent that her opinions conflicted with the record regarding his impairments and his ability to work. He has claimed that the ALJ's analysis was flawed because he credited Dross's input on the impact of Glover's stroke but rejected her assessment to the extent that it conflicted with the record regarding the impact of his stroke. Glover has argued that the ALJ did not explain how Dross's opinions conflicted with the record or his ability to work. Therefore, he has concluded that the ALJ did not provide substantial evidence for this finding. The Commissioner has argued that the Appeals Council and the ALJ considered and reviewed Dross's statements. Additionally, she has claimed that the ALJ explained that he gave some weight to Dross's opinions but rejected her opinion that Glover had difficulty cooking and cleaning because it was inconsistent with the record.

Although the Appeals Council did not address Dross's opinions explicitly, it adopted the ALJ's findings at steps one, two, and three of the evaluation process, which included the ALJ's findings regarding Dross's opinions. Because the Appeals Council adopted the ALJ's findings, it considered Dross's opinions. The ALJ afforded Dross's opinions some weight but gave her opinions little weight to the extent that they conflicted with the record regarding Glover's ability to work. (Tr. 28). The ALJ did not identify a contradiction between the record and Dross's opinions.

The ALJ should have explained how Dross's opinions contradicted the record and Glover's ability to work. This court cannot follow the ALJ's reasoning for discounting Dross's opinions because he did not provide any explanation. The Commissioner has identified evidence that the ALJ could have found inconsistent with Dross's opinions and used to reject her conclusion. However, the Commissioner cannot rely on that evidence because the ALJ did not

16

rely on that evidence. *See* **Arnett v. Astrue**, 676 F.3d 586, 593 (7th Cir. 2012). The ALJ should explain why he found Dross's opinions inconsistent with the record on remand.

Finally, Glover has argued that the Appeals Council found incorrectly that he could perform his past relevant work. The Appeals Council found that Glover could perform his past work as a customer service representative as actually performed. (Tr. 5). The council concluded that its RFC assessment, including the use of a cane to stand and walk, would not preclude Glover's past work. (Tr. 5). Additionally, it relied on the VE's testimony to find that Glover could work as a customer service representative. (Tr. 5).

Glover has argued that the Appeals Council failed to discuss his specific duties and whether he could perform them. At the ALJ hearing, Glover testified that his major job duties included answering phones and speaking with customers. (Tr. 42). Glover has claimed that the Appeals Council overlooked his mental and speech impairments discussed above. He has indicated that his mental impairments would cause him to be off task more than five percent of the workday and that his speech impairment would prevent him from performing his past work. Although the ALJ discussed Glover's impairments, Glover has argued that the Appeals Council should have discussed how those impairments affected his specific job duties. As discussed above, this court has found that the Appeals Council and the ALJ did not discuss Glover's anxiety disorder adequately. Therefore, the ALJ should determine whether Glover's anxiety disorder, along with his impairments, would preclude the specific duties of his past work on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 6th day of January, 2016.

/s/ Andrew P. Rodovich
United States Magistrate Judge